LUTCHER & MOORE LUMBER CO. v. BEAUMONT, S. L. & W. RY. CO. et al.

No. 1549—5868.

Commission of Appeals of Texas, Section A. May 16, 1932.

Fulbright, Crooker & Freeman and Carl G. Stearns, all of Houston, for plaintiff in error.

Andrews, Streetman, Logue & Mobley, of Houston, for defendants in error.

SHARP, J.

Lutcher & Moore Lumber Company filed this suit in the district court of Harris county against Beaumont, Sour Lake & Western Railway Company and Orange & Northwestern Railway Company to recover $1,744.77 alleged to be charged by the railroad companies

in excess of the lawful rates established by the Railroad Commission of Texas for the transportation of lumber in carloads over the lines of the railroads from Orange, Tex., to Houston, Tex., during the period from October 1, 1920, to April 28, 1922.

The defense set up by the railroads was that the lawful rate only was charged and collected.

The case was tried before the court without a jury. The trial court rendered judgment in favor of the railroad companies, which was affirmed by the Court of Civil Appeals. 33 S.W.(2d) 1077. A writ of error was granted.

Plaintiff in error contends that the Court of Civil Appeals erred in holding that during the period from December 31, 1919, when Texas Lines Tariff No. 36 went into effect, until August 26, 1920, when the Railroad Commission of Texas issued its Circular No. 5326, increasing rates 33⅓ per cent., 11 cents per 100 pounds was the lawful rate applicable on shipments of lumber moving by rail between Orange, Tex., and Houston, Tex.

Defendants in error in reply thereto contend that the rates charged and collected by the railroad companies were the lawful and proper rates applicable to plaintiff in error's traffic; that therefore there was no overcharge and the trial court rendered the correct judgment.

Plaintiff in error bases its claim for recovery upon excess charges made by the railroad companies for lumber shipments during the period from October 1, 1920, to April 28, 1922. This contention involves the interpretation of various tariffs, circulars, rate orders, and the like for the purpose of ascertaining what was the lawful rate applicable to shipments of lumber transported from Orange to Houston during the period above stated.

Congress enacted the Federal Possession and Control Act (39 Stat. 645, § 1 [10 USCA § 1361]), which authorized the President "to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the * * * transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable." In pursuance of this act the President did on the 28th day of December, 1917, issue his proclamation and take possession and assume "control at 12 o'clock noon on the 28th day of December, 1917, of each and every system of transportation and the appurtenances thereof located wholly or in part within the boundaries of the Continental United States." Section 10 of the Federal Control Act of March 21, 1918, 40 Stat. 451, c. 25, provided in part "that during the period of Federal control * * * the President may initiate rates, fares, charges, classifications, regulations, and practices." The lines of defendants in error were taken into possession and placed under the control of the federal government along with the other systems of transportation.

In the same proclamation the President designated a Director General of Railroads and directed that the possession and operation of such transportation system should be exercised by and through the Director General. In this connection, the President, among other things, further proclaimed that: "Until and except so far as said Director shall from time to time otherwise by general or special orders determine, such systems of transportation shall remain subject to all existing statutes and orders of the Interstate Commerce Commission and to all statutes and orders of regulating Commissions of the various States in which said systems or any part thereof may be situated. But any orders, general or special, hereafter made by said Director shall have paramount authority and be obeyed as such."

The next day after he had taken possession and assumed control of the various lines of railway, the Director General of Railroads issued his General Order No. 1, which, among other things, provides as follows: "Existing schedules or rates and outstanding orders of the Interstate Commerce Commission are to be observed, but any such schedules or rates or orders as may hereafter be found to conflict with the purposes of said proclamation or with this order shall be brought immediately by wire to the attention of the director."

The agreed statement of facts filed by the parties to the suit recites: "That under General Order No. 28 of the Director General of Railroads the existing lumber rates, effective June 25, 1918, were increased twenty-five per cent (25%). The effect of this advance was to increase any rate which may theretofore have been six cents (6¢) per 100 pounds to seven and one-half cents (7½¢) per 100 pounds and to increase any rate which may theretofore have been eight and three-fourths cents (8¾¢) per 100 pounds to eleven cents (11¢) per 100 pounds."

Again it is agreed by the parties: "That in Texas Lines Tariff No. 36, A. C. Fonda's I. C. C. No. 73, effective December 31, 1919, Item 330, the Director General of Railroads of the United States Railroad Administration published a mileage scale of rates to apply to the intrastate transportation in Texas of lumber moving between points on the Beaumont, Sour Lake & Western Railway and the Orange & Northwestern Railroad. This scale provided a rate of eleven cents (11¢) per 100 pounds for distances in excess of fifty-five miles. Said tariff was the only

tariff at the time published by the Director General of Railroads which specifically purported to state rates, between the points here involved, on lumber and articles taking the same rates. Said tariff did not contain, nor did any other lumber tariff published by the Director General of Railroads contain Circular No. 5198 of the Railroad Commission of Texas or any of the terms or provisions thereof. Said circular was published in other tariffs of the Railroad Administration, but not in tariffs specifically applying on lumber."

On December 31, 1919, the Director General published a tariff "Texas Lines Tariff No. 36, A. C. Fonda's I. C. C. No. 73," containing rates on lumber, which set forth a general mileage scale of rates for the transportation of lumber moving between points on the Beaumont, Sour Lake & Western Railway and the Orange & Northwestern Railway, which for the distance from Orange to Houston, viz., "over 55 miles," named a rate of 11 cents per 100 pounds. Under the order of the Interstate Commerce Commission in Ex Parte 74, Increased Rates 1920, 58 I. C. C. 220, the Railroad Commission of Texas, effective August 26, 1920, ordered an increase in existing lumber rates of 33⅓ per cent. The effect of this advance was to raise all 7½-cent rates to 10 cents and all 11-cent rates to 14½ cents.

The principal Texas railways, including the defendants in error herein, being dissatisfied with said order of the Railroad Commission of Texas ordering an increase of 33⅓ per cent., filed a complaint with the Interstate Commerce Commission, Docket No. 11764, alleging that the 33⅓ per cent. increase constituted an unjust discrimination against interstate commerce in view of the fact that in southwestern territory, which included Texas, the Interstate Commerce Commission, in Ex Parte 74, had authorized an increase of 35 per cent., and prayed that this discrimination might be removed. The Interstate Commerce Commission sustained this complaint, and ordered that the rate be increased from 33⅓ per cent. to 35 per cent.

By the terms of the Transportation Act 1920 (41 Stat. 456), federal control of the railroad lines terminated on March 1, 1920. Section 208 (a) of that act (49 USCA § 76 (a) provides as follows: "All rates, fares, and charges, and all classifications, regulations, and practices, in any wise changing, affecting, or determining, any part or the aggregate of rates, fares, or charges, or the value of the service rendered, which on February 29, 1920, are in effect on the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by State or Federal authority * * * of law; but prior to September 1, 1920, no such rate, fare, or charge shall be * * * changed in such manner as to reduce any such rate, fare, or charge, unless

such reduction or change is approved by the Commission."

This act (section 209 [49 USCA § 77]) also provides for a guaranty to carriers after termination of federal control as follows: "The term 'guaranty period' means the six months beginning March 1, 1920."

But it is contended by plaintiff in error that the tariff embraced within Circular No. 5198, adopted by the Railroad Commission of Texas on November 17, 1917, whereby the said railroads were required to observe "all commodity rates currently in effect between Galveston, Texas, and Orange, Texas," as "maxima on shipments of the same commodity transported between Houston, Texas, and Orange, Texas." That this mileage scale of rates had no application whatever "where existing special rates are lower." And since the 6-cent rate was a special rate which was lower than the mileage scale of rates, it follows that the mileage scale of rates had no application from Orange to Houston.

This contention rests upon the proposition that the rates contained in Circular No. 5198 were merely suspended during the period when the railroad lines were under federal control, and when federal control terminated the rates in Circular No. 5198 again became effective. That contention is sound if the rates embraced in Circular No. 5198 were merely suspended during the period of federal control and were not superseded by the rates contained in Texas Lines Tariffs No. 36, A. C. Fonda's I. C. C. No. 73, effective December 31, 1919, and the tariff of Increased Rates, 1920, 58 I. C. C. 220, authorized certain increases effective August 26, 1920, in the rates, fares, and charges then existing, and those embraced within Circular No. 5326, effective August 26, 1920, within the guaranty period, whereby the Railroad Commission of Texas authorized an increase of 33⅓ per cent. in all existing rates, which was ordered increased by the Interstate Commerce Commission to 35 per cent. in Docket No. 11764.

It is further argued by plaintiff in error that on August 21, 1920, when the Railroad Commission of Texas issued its Circular No. 5326 and thereby authorized all railroads in Texas to increase "all existing rates" 33⅓ per cent., the existing rate on lumber in carloads from Orange to Galveston was 7½ cents per 100 pounds. That increasing the 7½-cent rate 33⅓ per cent. made the rate 10 cents per 100 pounds, and that the 10-cent rate thus established was not affected by the Interstate Commerce Commission's order in Docket No. 11764 reported in 60 I. C. C. 421.

The change from 33⅓ per cent. increase to the 35 per cent. increase became effective March 5, 1921. Between March 5, 1921, and May 20, 1922, no changes were made in the rates applicable to any shipments involved herein. During the period from October 1,

1920, to April 28, 1922, the shipments of lumber involved in this state moved between Orange and Houston. The plaintiff in error was compelled to pay 14½ cents per 100 pounds on all shipments which moved prior to March 5, 1921, and 15 cents per 100 pounds on all shipments which moved subsequent thereto. The authority of the railroad lines to collect the foregoing rates rests upon the orders entered by both the state and federal authorities.

Recapitulating, it is seen that the Railroad Commission of Texas, by its order effective August 26, 1920, affirmatively raised the rate of 11 cents per 100 pounds to 14½ cents per 100 pounds. This order was in harmony with the order of the Interstate Commerce Commission effective August 26, 1920, authorizing the increase of rates upon lumber shipments applicable to the state of Texas to 35 per cent. The logical effect of these orders was to increase the rate from 11 cents up to 14½ cents per 100 pounds. By order of the Interstate Commerce Commission in Docket No. 11764 the rate was increased to 15 cents per 100 pounds. By the adoption of these orders the tariffs contained in Circular No. 5198, which conflicted therewith, were repealed.

The power of Congress to authorize the exercise of the federal power over intrastate rates reasonably necessary for the protection of interstate commerce is now thoroughly settled. Dayton-Goose Creek R. Co. v. United States, 262 U. S. 455, 44 S. Ct. 169, 68 L. Ed. 388, 33 A. L. R. 472; Missouri P. R. Co. v. Boone, 270 U. S. page 466, 46 S. Ct. 341, 70 L. Ed. page 688; Railroad Commission v. C. B. & Q. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371, 22 A. L. R. 1086; H. E. & W. T. R. R. Co. v. U. S., 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; Colorado v. U. S., 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878.

But it is urged that defendants in error have agreed that the tariffs contained in Circular No. 5198 have never been repealed or amended, and, therefore, the tariff rates contained therein are effective and in force. The various tariffs and circulars adopted by the state and federal authorities with respect to the charges to be made by the railroad lines on this class of shipments are embraced within the agreed statement of facts. Whether or not the rates contained in Circular No. 5198 have been superseded by the acts of the Railroad Commission of Texas, and the Interstate Commerce Commission, above described, is a question of law for decision in this case, and it is not a question that can be controlled by agreement of the parties. The law provides that parties may submit matters in controversy to the court upon an agreed statement of facts, but the legal effect of the facts is a matter for the court to determine.

We find no reversible error in the assignments presented and recommend that the judgment of the Court of Civil Appeals be affirmed.

CURETON, C. J.

The judgment of the Court of Civil Appeals, affirming that of the district court, is affirmed, as recommended by the Commission of Appeals.